IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAMIAN DURFLINGER                                                                    PLAINTIFF

           v.                  Civil No. 5:20-cv-05091

SHERIFF TIM HELDER,
Washington County, Arkansas;
DEPUTY GERARDO CERVANTES;
DEPUTY ANDREW WHISENHUNT;
DEPUTY DAVID TONSBEEK;
DEPUTY JORDAN MYATT;
DEPUTY JOHNATHAN GLASS;
CORPORAL DUSTIN CARTER;
SERGEANT JAMES MORSE;
CORPORAL MULVANEY;
SERGEANT MARIAH CARRIER; and
CORPORAL JOEL MINOR                                                               DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Damien Durflinger ("Durflinger"), currently an inmate of the Delta Regional Unit of the Arkansas Division of Correction, filed this *pro se* civil rights action under 42 U.S.C. § 1983. Durflinger proceeds *pro se* and *in forma pauperis* ("IFP").   The claims at issue in this case arose while Durflinger was incarcerated in the Washington County Detention Center ("WCDC"). Durflinger contends Defendants violated his federal constitutional rights by failing to protect him from a fellow inmate and by denying him access to the courts.

Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable P. K. Holmes, III, United States District Judge, referred this case to the undersigned for the purpose of making this Report and Recommendation on the pending Motion for Summary Judgment (ECF No. 65) filed by the Defendants.   Durflinger has responded (ECF No. 79) to the Motion and it is ready for decision.

1

## I.     APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor."   *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."   *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.     DISCUSSION

Durflinger was booked into the WCDC on March 10, 2020, on pending criminal charges. (ECF No. 67-2 at 1).[1]   He remained incarcerated there until June 3, 2020.   *Id.* at 4.

---

[1] All record citations are to the CM/ECF document number and page number.

## A.     Failure to Protect

### 1.  Summary of the Facts

On April 15, 2020, Durflinger and fellow inmate Jemal Gardner ("Gardner") were involved in a fight lasting approximately ten seconds.[2]  (ECF No. 67-5 at 3; Video Exhibit A-7). Durflinger was examined by medical staff and noted to have a one-inch laceration above his right eye brow.  (ECF No. 67-4 at 4).   The laceration was closed with sterile strips and a bandage.  *Id.* No other injuries were noted.  *Id.*   The following day the laceration was closed using an adhesive. *Id.* at 5.   At that time, Durflinger was noted to have a moderate hematoma of the right upper eyelid with ecchymosis (bruising) below the eye.  *Id.*   Both inmates were re-housed.  (ECF No. 67-14 at 1).   Corporal Carter was "part of the re-housing process that followed which included entering 'keep separate' directions between the inmates so that they would not be re-housed together."  *Id.* Unknown to him at the time, Corporal Carter "apparently hit the wrong button and exited the screen without actually saving the keep separate."  *Id.*   In fact, the "button caused the entry to clear rather than save."  *Id.*; *see also* ECF No. 67-3 at 27 (Corporal Mulvaney's explanation of how the "keep separate" entry was accidentally cleared).

Both Durflinger and Gardner were charged with "battery use of physical force upon a detainee."  (ECF No. 67-5 at 1).   Gardner's disciplinary hearing was held on April 22, 2020, and he was found guilty and sentenced to ten days in disciplinary segregation.  *Id.* at 6.   On April 23, 2020, Durflinger's hearing was held, and he was found guilty and sentenced to ten days in disciplinary segregation.   *Id.* at 7.

On April 23, 2020, Corporal Minor was asked to find disciplinary segregation housing for

---

[2] Defendants' Exhibit A-7 is a USB flash drive containing video of the fight.   On the video timer, the fight begins at 28:26 and ends at 28:36.

Durflinger.   (ECF No. 67-16 at 1).   Corporal Minor "checked [Durflinger's] inmate classification and checked SOMS (Sheriff's Office Management System) for incompatibles."   *Id.*   Corporal Minor found no incompatibles with any other inmate already in cell M-23.   *Id.*   Corporal Minor asked his floor deputies to place Gardner in cell M-23.   *Id.*   Deputy Whisenhunt was asked to assist Corporal Cervantes "in moving Durflinger to Disciplinary Segregation M-Block."   (ECF No. 67-15 at 1).   Deputy Whisenhunt was "instructed to place Durflinger in cell M-23."   *Id.* Durflinger did not say anything when he was placed in the cell.   *Id.* at 2.

Cell M-23 was already occupied by Gardner and another inmate, Scott Walker.   (ECF No. 67-10 at 49).   Durflinger testified in his deposition that when he was put in the cell, Gardner was "laying on his rack under the cover, so I really couldn't see who he was.   So they placed me in the cell and locked it.   Then I realized that was I was in there with, you know, my enemy."[3]   *Id.* at 50.   Durflinger did not know what to do so he "sat there and hoped that everything might be all right."   Later, Gardner said he wanted Durflinger's biscuit in the morning.   *Id.* at 51.   At about lights out, Gardner slapped Durflinger.   *Id.*   Durflinger had been in the cell for about five hours at that point.   *Id.*   The following morning, Durflinger had to give Gardner his biscuit.   (ECF No. 67-3 at 21).

When Durflinger was let out of the cell in the morning, he submitted a grievance.   (ECF No. 67-10 at 51, 53; ECF No. 67-3 at 19 (request submitted at 10:40 a.m.)).   In the grievance, Durflinger said he was "in fear for my life.   [B]ad things are going to happen, and are happening." (ECF No. 67-3 at 19).   Durflinger also told Deputy Glass, Deputy Myatt, and Deputy Tonsbeek, that he was in the cell with someone he had been in a fight with.   (ECF No. 67-10 at 51-52).   He

---

[3] Defendants' Exhibit A-7 also contains video of Durflinger being placed in cell M-23 on April 23, 2020.   Durflinger does not hesitate to enter the cell.

informed the deputies that something needed to be done about it.   *Id.*   Durflinger indicates he told the officers that anything could happen, and Gardner looked ready to fight.   (ECF No. 67-3 at 21). Durflinger was told to go back to his cell, and they would check on it.   (ECF No. 67-10 at 52). According to Durflinger, he stayed in the cell for another four hours before he was moved out. *Id.*; *see also* ECF No. 67-3 at 68 (legal request in which Durflinger states it was four hours before he was pulled back out of the cell).

There is some confusion about when the deputies contacted pod control.   According to Deputy Myatt, one of them called pod control and asked if "there was a pop-up indicating that Durflinger was housed incorrectly with anyone in his cell.   They indicated that there was no such pop-up." [4]   (ECF No. 67-18 at 2).   At this point, Deputy Myatt states it was "then suggested that Durflinger be returned to his cell for the time being, so that we could figure out what was going on with the situation.   *Id.*

Deputy Tonsbeek states they decided to put Durflinger back in the cell "because it appeared there was no actual problem between Durflinger and Gardner."   (ECF No. 69-1 at 1-2).   In fact, he asserts that "[a]s we walked up the stairs to the cell, Durflinger slapped the shoulder of detainee Gardner and made jokes to him (as if a friend) about fighting.   I took it as two friends just joking around, which does happen a lot in jail."   *Id.* at 2.   Deputy Tonsbeek and Deputy Glass state they went to pod control after Durflinger was placed back in the cell.   *Id.*; ECF No. 67-17 at 2.   All three deputies state Durflinger had no visible injuries.   (ECF Nos. 67-18 at 1; 67-17 at 1; 69-1 at 1).

---

[4] Defendants Exhibit A-7 also contains a video of Durflinger on the morning of April 24, 2020.   After he is seen using the kiosk, he speaks with the three officers who entered the cell.   As Durflinger accurately points out, none of the officers appear to use their radios.   Durflinger returns to cell M-23.   He makes no effort to resist being placed back in the cell.

Durflinger denies he was joking with Gardner or slapped him on the shoulder.   (ECF No. 79 at 62).   The video exhibit, *Defts' Exhibit* A-7, supports Durflinger because it shows no such interaction between Durflinger and Gardner.   Durflinger likewise maintains he had visible injuries—a black eye and a one-inch laceration on his forehead.   (ECF No. 79 at 69).

At about 12:05 p.m., Sergeant Carrier reviewed Durflinger's grievance that had been submitted at 10:27 a.m.   (ECF No. 67-12 at 2).   As soon as she reviewed the grievance, Sergeant Carrier "immediately called A-pod . . . to see if this was true.   I told Cpl. Minor that, if it was true, Durflinger and Gardner should be separated."   *Id*.   According to Carrier, Durflinger was immediately removed from the cell he was in with Gardner.   *Id*.   At 2:49 p.m., Sergeant Carrier responded to Durflinger noting he had been moved to a different housing location.   (ECF No. 67-3 at 19).   She asked if he had said "anything to any deputy about not being housed with this person?"   *Id*.   Durflinger responded that he told the guards as soon as he was able to get out of the cell.   *Id*. at 20.   Despite this, Durflinger states he was put back in the cell with Gardner.   *Id*.

Sergeant Carrier checked the computer, reviewed the April 15 incident reports, and the disciplinary reports, and she determined that an "incompatible" between the two inmates was warranted due to the April 15 fight.   (ECF No. 67-12 at 2).   She later discovered that an incompatible had been entered but had been cleared in error.   *Id*.    The error was not discovered until April 24th.   *Id.*

As one of the supervisors, Sergeant Carrier "issued letters of reprimand for Deputies Tonsbeek, Glass, and Myatt because [she] did not feel that they followed policy by placing Durflinger back in the cell while they checked on the situation after he reported he was housed in error."   (ECF No. 67-13 at 3).   The letters of reprimand are all dated May 6, 2020, but none are

6

signed by Sergeant Carrier, the recipients, or a witness although there are signature lines for each. (ECF No. 67-13 at 1-6).

Corporal Minor's incident report indicates Durflinger was moved at approximately 12:00 p.m. on April 24, 2020.   (ECF No. 67-5 at 14).   His report, however, was not entered until April 29, 2020.   *Id*.   Deputies Tonsbeek and Glass assisted Corporal Minor.   *Id*. at 15.   Their reports also indicate that Durflinger was moved at approximately 12:00 p.m.

According to Corporal Mulvaney, "[i]nmates are classified and housed based on a system that considers their criminal charge, their history, and any other known security issues such as known enemies or co-defendants within the facility."   (ECF No. 67-1 at 3).   If inmates are "involved in an altercation or there is a threat of an altercation between them, deputies on the shift during which the altercation or threat are reported are directed to enter a 'keep separate' [or pop-up] direction into the computer systems for both inmates."   *Id*.   If an inmate is being rehoused, "officers who direct the re-housing check the computer systems to avoid housing inmates who have a 'keep separate' together before directing inmates as to the appropriate location to re-house the inmate."   *Id*.

### 2.   Analysis of Plaintiff's Claims

Under the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners.[5]   *See Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998).   However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."   *Farmer v.*

---

[5] While Durflinger was a pre-trial detainee with respect to his pending charges and thus falls under the protection of the Fourteenth Amendment, the Eighth Circuit has applied the deliberate indifference standard of the Eighth Amendment to pretrial detainee's failure to protect claims.   *See e.g., Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021).

*Brennan*, 511 U.S. 825, 834 (1994).

To prevail on his failure to protect claim, Durflinger must satisfy a two-prong test: (1) he must show he was "incarcerated under conditions posing a substantial risk of serious harm"; and (2) the prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) (cleaned up). The first prong is an objective requirement to ensure the deprivation is a violation of a constitutional right. *Id*. The second, however, is subjective requiring Durflinger to show the officials "both knew of and disregarded 'an excessive risk to inmate health or safety.'" *Id*. (quoting *Farmer*, 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon Cnty.*, 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted).

### a. Deputy Carter

Durflinger's claim against Deputy Carter fails because at most he was negligent in failing to ensure he had saved the incompatible notation. There are no facts suggesting Deputy Carter acted intentionally or with deliberate indifference in failing to save, or clearing, the incompatible notation. Negligence cannot give rise to a failure to protect claim. *Id*.

### b. Corporal Minor, Deputy Cervantes, and Deputy Whisenhunt

Corporal Minor was asked to find disciplinary housing for Durflinger. He checked for incompatibles, and finding none, he directed his floor deputies to place Durflinger in cell M-23. (ECF No. 67-16 at 1). Deputies Cervantes and Whisenhunt followed orders and placed Durflinger

in cell M-23.   (ECF Nos. 67-15 at 1-2; 67-10 at 60-61).   Durflinger made no protest as he did not realize until later that Gardner was in the same cell.   (ECF No. 67-10 at 50).

Durflinger believes everyone in the jail knew that he had been in a fight with Gardner. (ECF No. 67-10 at 61).   In his view, given that it is a small jail, he believes staff should have known about the fight.   *Id*. at 62.   In fact, he asserts "that there is no possible way that they wouldn't have known."   *Id*.   He holds this belief despite his admission that there are probably about a total of 600 people, including both staff and inmates, in the WCDC.   *Id*. at 64.

There is no genuine issue of material fact as to whether Corporal Minor, or Deputies Cervantes and Whisenhunt acted with deliberate indifference to a known serious risk to Durflinger. Minor checked the computer system prior to deciding which cell Durflinger should be placed in. Deputies Cervantes and Whisenhunt were simply following orders to place Durflinger in cell M-23.   Durflinger made no protest at the time.

Additionally, the Eighth Circuit had held that a plaintiff must assert an injury that is greater than *de minimis* to make a claim under the Eighth Amendment.   *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008) ("Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis*"); *Ellis v. Chambers*, No. 11-5146, 2012 WL 2449868 (W.D. Ark. May 25, 2012) (black eye is a *de mimimis* injury).   Durflinger's only injury from being slapped was to his eye that was already black as a result of the April 15th fight.   Specifically, Durflinger testified that after the April 15th fight, he had "a little bit of a black eye."   (ECF No. 67-10 at 55).   After he was slapped, Durflinger testified he "ended up having a big black eye."   *Id*.   This injury is *de mimimis* and cannot support this claim under the Eighth Amendment.[6]

---

[6] Additionally, the physical injury requirement of 42 U.S.C. § 1997e(e) bars a prisoner from recovering compensatory damages for mental and emotional injury in the absence of a physical injury.   The Eighth Circuit has interpreted §

### c.  Deputies Myatt, Glass, and Tonsbeek

Regarding Durflinger's claims against Deputies Myatt, Glass, and Tonsbeek, it is undisputed that Durflinger told the deputies that he had previously been in a fight with Gardner and should not be housed with him.   Nevertheless, Durflinger was placed back in the cell with Gardner and remained there for up to four hours.   Durflinger maintains, and we will assume for purposes of this motion, that he still bore visible injuries from the April 15th fight—a healing laceration on his forehead and a healing black eye.

These claims present a closer question than did Durflinger's claims against Deputies Carter, Cervantes and Whisenhunt, or Corporal Minor.   As noted above, to establish a failure to protect claim, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer*, 511 U.S. at 837.   The objective component may be established "in the usual ways, including inference from circumstantial evidence . . . [A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."   *Id*. at 842.   In this case, the Court believes the risk of harm to Durflinger was obvious.   Durflinger reported having been in a fight with Gardner.   He advised the deputies that he believed he was in danger and Gardner looked ready to fight.

While the facts are sufficient to establish the objective component of the failure to protect claim, Durflinger cannot meet the subjective component.   "The question is whether [the deputies] ha[d] a sufficiently culpable state of mind, meaning that [they were] deliberately indifferent to" Durflinger's safety.   *Riley v. Olk-Long*, 282 F.3d 592, 595 (8th Cir. 2002).   Acting unreasonably

---

1997e(e) to require more than a *de minimis* physical injury before compensatory damages may be recovered.   *McAdoo v. Martin*, 899 F.3d 521, 525 (8th Cir. 2018).

or in violation of detention center policy is not sufficient to establish deliberate indifference for Durflinger's safety.  *Pagels v. Morrison*, 335 F.3d 736, 742 (8th Cir. 2003) ("reasonableness is a negligence standard"); *Garnder v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) (no § 1983 liability for violation of prison policy).  "[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.  *Pagels*, 335 F.3d at 740-41 (internal quotation omitted).  While caution should have dictated that Durflinger not be placed back in the cell when he claimed he had fought with Gardner, the deputies checked, or had others check, if there were any pop-ups for Durflinger and none were found.  (ECF Nos. 67-18 at 2; 67-17 at 2; 69-1 at 2).  There is no genuine question of fact as to whether these deputies acted with deliberate indifference towards Durflinger's safety.  Moreover, as discussed above, Durflinger suffered only a *de minimis* injury.

### d. Sergeant Carrier

Sergeant Carrier first became involved when she read Durflinger's grievance shortly after noon on April 24, 2020.  (ECF No. 67-12 at 2).  She immediately called Corporal Minor and told him that if what Durflinger had reported was true, Durflinger and Gardner should be separated. *Id*.  She researched the issue and found an "incompatible was, in fact, placed between Durflinger and Gardner, but cleared by error before it was entered in the system."  *Id*.  Durflinger maintains she did not do a "great investigation" because she did not include statements from him, Scott Walker, or Corporal Mulvaney.  (ECF No. 67-10 at 72).

There is no suggestion in the record, other than Durflinger's reported belief that everyone at the WCDC knew about the April 15th fight, that Sergeant Carrier acted with anything other than concern for Durflinger's safety once she received notice of the situation via his grievance.  In fact,

she ordered him removed from cell M-23.   While he denies being moved immediately, Durflinger concedes he was moved within three to four hours from the time Sergeant Carrier read the grievance.  (ECF No. 67-10 at 53, 59).   No genuine question of fact is presented as to whether Sergeant Carrier acted with deliberate indifference towards Durflinger's safety.

### e.  Sergeant Morse, Corporal Mulvaney, and Sheriff Helder

Durflinger believes Sergeant Morse should be held liable because he knew about the April 15th fight since he signed the incident reports.   (ECF No. 67-10 at 66).   Durflinger also believes Sergeant Morse was the pod control supervisor when Durflinger was placed in M-23.   *Id*.

With respect to Corporal Mulvaney, Durflinger indicates he was one of the people he talked to about the grievance.  (ECF No. 67-10 at 69).   Durflinger believes Corporal Mulvaney and Sergeant Carrier were supposed to get together regarding the investigation into his placement in cell M-23.   *Id*.

Durflinger contends Sheriff Helder is responsible for anything that happens in the WCDC. (ECF No. 67-10 at 59).   Durflinger concedes "there is no evidence that [Sheriff Helder] was involved besides being the Washington County jail supervisor."   *Id*. at 60.

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  *See Monell v. Dep't. of Soc. Srvs.*, 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994).   Supervisors can "incur liability ... for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference or tacit authorization of the violative practices."  *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010).

12

Sergeant Carrier and Corporal Mulvaney were involved in investigating the lack of an "incompatible" designation between Gardner and Durflinger and Durflinger's placement in cell M-23.   A supervisor's after-the-fact participation in reviewing grievances is "generally an insufficient basis to establish 'personal knowledge' for purposes of § 1983."   *See White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988) (warden's receipt of memos and grievances demanding medical treatment did not in and of itself establish warden's supervisory liability for denial of medical care).   Sergeant Carrier and Corporal Mulvaney were not personally involved in the events leading up to the failure to protect claim, but rather, they were involved only after Durflinger had submitted a grievance about the incident.

Similarly, Sheriff Helder was not personally involved in any of these events.   Instead, Durflinger seeks to hold him liable solely because he is over the jail.   This is insufficient. *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995) ("responsibility for supervising operations of a prison is insufficient to establish the personal involvement required to support liability").

### f.   Qualified Immunity

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"   *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).   Having found that the facts do not make out a constitutional violation, the individual Defendants are entitled to qualified immunity.   *See e.g., Krout v. Goemmer*, 583 F.3d 557, 564

13

(8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### g.  Official Capacity Liability

A suit against an employee in his or her official capacity is tantamount to an action directly against the employing governmental entity.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).   In this case, it is a suit against Washington County.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."  *Corwin v. City of Indep., Mo.*, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).   As no individual officers were found liable and they are entitled to qualified immunity, Washington County cannot be held liable.  *Ivey v. Audrain Cnty., Mo.*, 968 F.3d 845, 851 (8th Cir. 2020) (if the individual officers are entitled to qualified immunity under the first prong on the analysis, *i.e.,* no evidence of a constitutional violation, then the county cannot be held liable); *Schoelch v. Mitchell*, 625 F.3d 1041, 1048 (8th Cir. 2010) ("Because we conclude that [Plaintiff] has not presented a submissible case that any officer committed a constitutional violation, the claim for municipal liability necessarily fails as well").

### B.      Access to the Courts

### 1.      Summary of the Facts

The record reveals that indigent supplies "are generally passed out once per week on Sundays.   Inmates who are indigent are given hygiene supplies for the week, several sheets of paper, and two stamped envelopes that they may use for personal or legal mail."  (ECF No. 67-1 at 3-4).   Deputies are provided with a list of inmates who qualify as indigent.  *Id*. at 4.   "Inmates

who had more than $4.00 in their commissary account in the seven-day period preceding the determination are not considered indigent." *Id*. Postage stamps may be purchased from the commissary. *Id*. "Mail that is returned by the post office because it does not bear sufficient postage is returned to the inmate for additional postage." *Id*.

At the time of the events involved in this case, the WCDC had no law library on site.[7] (ECF No. 67-1 at 4).

> Inmates were directed to contact their attorney, or their family for identified legal materials or to petition the court for a transport order allowing the Washington County Sheriff's Department to arrange for and transport the inmate to the Washington County Law Library which is housed in the County Courthouse.

*Id.* When Durflinger asked for the address of the court to request a transport order, he was given the Washington County Circuit Clerk's Office address. *Id*.

On March 14, 2020, Durflinger submitted a request stating he needed access to the law library because he had a pending case in the Arkansas Supreme Court, needed to file a lawsuit in small claims, needed to look up registration laws, and had a lawsuit to file against Detective Wilson. (ECF No. 67-3 at 35, 60). In response he was told: "We cannot transport unless there is an order from the court to do so. Try contacting the Public Defender's office or the court to have one made so we can transport you." *Id*. at 60.

On March 15, 2020, Durflinger wrote that he did not have time to go through the courts and needed a continuance by March 19, 2020. (ECF No. 67-3 at 35). He requested a letter that he had no access to a law library "to look up case laws or anything for my case." *Id*. He indicated that he needed to write a brief and had no way to make a legal argument. *Id*. He again asked for

---

[7] Beginning on April 21, 2020, the WCDC made legal material available electronically through the kiosks located in each housing area. (ECF Nos. 67-1 at 4, 67-3 at 51).

a letter "asap" so he could send it to the court.  *Id*.  Corporal Mulvaney responded:

> You will need to contact one of the circuit judges to see about getting a transport order to get access to our law library due to it not being on site.   We have had these granted before in the past, but it will be up [to] the judge, and or, courts.
>
> We will not be writing any letters for you, nor are we mandated to do this.

*Id*. at 36.

On March 17, 2020, Durflinger wrote: "[B]y law [I] need access to a law library inside this facility and if [I] had access [I] would show you the real law where it states it."  (ECF No. 67-3 at 38).   That same day, Sergeant Sears responded that Durflinger would have to get a transport order through the courts.   *Id*.   Durflinger was advised that they were working on getting the law library on the kiosk, but it had not happened yet.   *Id*.

On March 20, 2020, Durflinger asked for copies of his grievances to send to the courts so he could get a continuance since he did not have time to request transport through the court.   (ECF No. 67-3 at 38).   Corporal Mulvaney stated the only documents they were required to copy for inmates were commitment orders.   *Id*.   Otherwise copies of other documents were provided only when they were served with a court order signed by a judge.   *Id*.

On March 22, 2020, Durflinger asked what court and what address he was supposed to write to.   (ECF No. 67-3 at 69).   Sergeant Lunsford responded giving Durflinger this address: 208 N. College Ave., Fayetteville, AR 72701.   *Id*.   He was told to address it to the Circuit Court Judge and state why he needed to use the law library and for how long.   *Id*.

On March 28, 2020, Durflinger wrote:

> [I] have legal mail [I] have to send out.   [I] have 2 cents on my books.   [I] addressed my mail as legal and got it back because it says [I'm] not indigent.   This mail has a deadline and needs a way to go out.   [Y]ou are withholding my legal mail from being sent.

(ECF No. 67-3 at 40).   Sergeant Lunsford responded: "We have to go by the list that commissary gives us.   I apologize for the inconvenience, but if you are not indigent, you will have to have stamps to send mail."   *Id*.

> On March 29, 2020, Durflinger wrote:
>
> [T]here has to be a way for me to send legal mail.   [T]his is to get a transportation to a law library.   [I] am behind now writing a brief in the supreme court.   [I've] asked for a letter from you guys explaining that there[]is no law library here so [I] could get a continuance.   [I] was told by you guys that [I] had to get a transport, [I've] wrote a request for a transport, now [I] can[']t get that legal mail to go out in time.   [T]here is no money on my books, you should send out legal mail.   [T]his whole situation puts me way behind and might cost me my case if it hasn[']t already.   [I] don't have time for this stuff.

(ECF No. 67-3 at 40).   Lieutenant Ridenoure responded that they would send out any legal mail Durflinger had.   *Id*.

On April 1, 2020, Durflinger submitted a grievance stating that the mail had been returned to him again with a notation that he was not indigent.   (ECF No. 67-3 at 42).   Because of this hold up, Durflinger said he was late getting out his request for transport.   *Id*.   He pointed out that he had no money on his books and had not had any since "last tue[sday] when I spent my last 5 dollars."

Corporal Mulvaney in response noted that on March 19, 2020, Durflinger had sent a letter to the Arkansas Supreme Court, on March 26 a letter to federal court, and that same day a personal letter.   (ECF No. 67-2 at 43).   During this time period, Durflinger had purchased only one stamp but had spent almost $40 on commissary.   *Id*.   If he is indigent, Corporal Mulvaney noted he would be allowed to send two letters per week with the WCDC paying the postage.   *Id*.   It was up to the inmate whether the letters were used for personal or legal mail.   *Id*.   Corporal Mulvaney

advised that the WCDC was not required to send out all "free" legal mail Durflinger wanted to send and were not mandated to do so.   *Id.*

On April 1, 2020, Durflinger wrote that there had to be a way for his legal mail to go out. (ECF No. 67-3 at 44).   He stated he was trying to get a court order for transport to the library.   *Id.* Without access to the law library, Durflinger said he had no way to write his brief that was due by March 17th.   *Id.*   In response, on April 3rd, Corporal Mulvaney asked Durflinger to give the letter to a floor officer and have them bring it to him.   *Id.* at 45.   Corporal Mulvaney said he would ensure the letter went out.   *Id.*

On April 4, 2020, Durflinger submitted a grievance noting that he had been given the wrong address for his letter asking for transportation to the law library.   (ECF No. 67-3 at 9).   He indicated that he now had to write another letter and wait another couple of weeks.   *Id.*   He stated this was prejudicial to his cases as he was acting *pro se.*   *Id.*   Corporal Mulvaney responded that Durflinger had been provided the address shown for a county circuit judge.   *Id.* at 10.   Further, Corporal Mulvaney noted he personally made sure the letter went out even though he did not have to per their policies and procedures.   *Id.*

On April 7, 2020, Durflinger submitted a grievance complaining that at the instruction of Sergeant Lunsford he had written to 280 N. College, Suite 302, Fayetteville, AR 72701 to obtain a transport order to the law library.   (ECF No. 67-3 at 48).   Durflinger stated he had received a letter back from the court clerk stating this was not a pleading this office can act on.   *Id.*   Corporal Mulvaney responded that he apologized for the inconvenience and Durflinger's letter apparently went to the circuit clerk's office.   *Id.* at 49.   Corporal Mulvaney added that the street address was correct, but the suite number should be 401 not 302.   *Id.*   Durflinger was also advised to make

sure he addressed his letter to a Circuit Court Judge.   *Id.*   If Durflinger had any issues getting his letter sent out, he was advised to let Corporal Mulvaney know, and he would make sure the mail went out.   *Id.*   Corporal Mulvaney also noted that Durflinger had purchased five stamps from commissary.   *Id.*

On April 21, 2020, Durflinger lodged another grievance stating he had to make sure his mail had gone out.   (ECF No. 67-3 at 11).   That day, Corporal Mulvaney responded that he made sure the letter went out on April 9th.   *Id.* at 12.   Durflinger was also told that the law library was now available on the kiosk.   *Id.*

On April 28, 2020, Durflinger asked Corporal Mulvaney for the address of the court he was told to write to about getting a transport order.   (ECF No. 67-3 at 76).   Durflinger indicated he was trying to make sure the judge received his mail and to get a receipt for it.   *Id.*   Corporal Mulvaney responded the address was: 280 N. College, Suite 401, Fayetteville, AR 72701.   *Id.* Durflinger was told he would not get a receipt for his letter.   *Id.*   He was also told there was nothing the detention center could do if the judge did not reply.   *Id.*   Durflinger was reminded that a law library was now available on the kiosk.   *Id.*

On May 27, 2020, Corporal Mulvaney added a comment that he had made an honest mistake and typed 280 instead of 208 as the building number.   (ECF No. 67-3 at 50).   Corporal Mulvaney stated that Durflinger was told to write to 208 N. College and put it to the attention of the circuit judge but instead wrote 280 N. College which is the address to the circuit clerk's office. *Id.*

The Court issued a subpoena to the Arkansas Supreme Court for certified copies of documents filed with the Arkansas Court of Appeals in *Durflinger v. State of Arkansas*, case

number CR-19-650.   (ECF No. 58-1).   The docket sheet indicates an appeal from the denial of

Durflinger's motion for post-conviction relief under Rule 37 of the Arkansas Rules of Criminal

Procedure was lodged on August 13, 2019, and Durflinger was advised that his brief was due on

September 22, 2019.   *Id*. at 1.   On September 23, 2019, Durflinger filed a motion for an extension

of time.   *Id*.   The motion was granted and Durflinger was notified his brief was due on December

15, 2019.   *Id*.   On November 4, 2019, Durflinger filed a motion for appointment of counsel and

a request for an extension of time to file his brief.   *Id*. at 1-2.   The motion for appointment of

counsel was denied but Durflinger was given an extension of time until March 3, 2020, to file his

brief.   *Id*. at 2.   On January 8, 2020, Durflinger filed another motion for an extension of time to

file his brief.   *Id*.   The request was granted, and an extension given until March 17, 2020.   *Id*.

It was noted to be the final extension.   *Id*.   On March 24, 2020, the court received a pro se motion

for continuance of the appeal.   *Id*.   The motion was "returned because it is too late to seek an

extension of time."   *Id*.   On April 6, 2020, Durflinger filed a motion for appointment of counsel

and to file a belated brief.   *Id*.   The motions were denied.   *Id*. at 3.   On February 24, 2021, the

appeal was dismissed.   *Id*.

## 2.   Analysis of Plaintiff's Claim

The Supreme Court has held "the fundamental constitutional right of access to the courts

requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers

by providing prisoners with adequate law libraries or adequate assistance from persons trained in

the law."   *Bounds v. Smith*, 430 U.S. 817, 828 (1977).   Nevertheless, *Bounds* "did not create an

abstract, freestanding right to a law library or legal assistance."   *Lewis v. Casey*, 518 U.S. 343,

351 (1996).   Instead, prison officials must provide inmates with "meaningful access to the courts,"

*Bounds*, 430 U.S. at 824, and providing a law library is merely one way to comply with this obligation.   *See Bear v. Fayram*, 650 F.3d 1120, 1123 (8th Cir. 2011) (the constitutional requirement of access to the courts may be satisfied in a number of ways including, prison libraries, jailhouse lawyers, private lawyers on contract with the prison, or some combination of these and other methods).

An inmate cannot prevail on an access-to-courts claim unless he can demonstrate he suffered prejudice or actual injury as a result of the prison officials' conduct.   *See Lewis*, 518 U.S. at 351-2; *see also Farver v. Vilches*, 155 F.3d 978, 979-80 (8th Cir. 1998) (per curiam); *Klinger v. Dep't of Corr.,* 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic); *McMaster v. Pung*, 984 F.2d 948, 953 (8th Cir. 1993).   "To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'"   *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted).

Here, Durflinger maintains the actual injury he suffered was his inability to file his brief with the Arkansas Court of Appeals.   Initially, Durflinger's brief was due on September 22, 2019. He applied for and was granted three extensions of time to file his brief.   On January 8, 2020, when he was granted an extension of time until March 17, 2020, he was advised this was the final extension.   Durflinger was not booked into the WCDC until March 11, 2020, only six days before his brief was due to be filed at the Court of Appeals.   Durflinger had, considering the initial

briefing schedule and the three extensions of time, a total of five months and twenty-five days within which to file his brief.   To ensure his brief was filed by March 17th he should have mailed it several days prior to March 17th.   Durflinger had funds in his commissary account but elected to use the money for food and candy items rather than stamps.   Even though Durflinger had no access to a library during the first six days of his incarceration, it was his own dilatory actions that caused him not to file his brief in a timely manner.[8]   Moreover, Durflinger has not shown that Defendants' actions resulted in the hindrance of a nonfrivolous and arguably meritorious legal claim.   Durflinger cannot prevail on his access to the courts claim.

## III.    CONCLUSION

For these reasons, it is recommended that the Motion for Summary Judgment (ECF No. 65) be **GRANTED,** and the case **DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of October 2021.

/s/  *Mark E. Ford*
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

---

[8] The Court does not condone in anyway the WCDC prior policy of requiring the prisoners to write to some unnamed Circuit Judge, before whom the prisoner had no pending case, to obtain library access.

22